DIMENSION FINANCIAL CORPORATION, Daniel T. Carroll, Harold D. Dufek, William L. Mitchell, Ronald L. Shaffer, A. Gary Shilling, State of Ohio, Ohio Division of Savings and Loan Associations, Ohio Deposit Guarantee Fund, Horizon Savings and Loan Company, Horizon Service Corporation, Permanent Savings and Loan Association, Financial Institutions Assurance Corporation, First Bancorporation, Colorado Industrial Bankers Association, Fort Lupton Industrial Bank, Monroe Industrial Bank, Castle Rock Industrial Bank, Ark Valley Industrial Bank, Household Weld County Industrial Bank, Household Lamar Industrial Bank, Household Alamosa Industrial Bank, Household Valley Industrial Bank, Household Salida Industrial Bank, Copper State Thrift & Loan Company, and Copper State Financial Corporation, Petitioners,

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent,**

American Financial Services Association and Household Finance Corporation, Intervenors.

Nos. 83–2696, 84–1011, 84–1122, 84–1257, 84–1270 and 84–1407.

United States Court of Appeals, Tenth Circuit.

Sept. 24, 1984.

Jeffrey S. Davidson of Kirkland & Ellis, Washington, D.C., (Dennis M. Gingold, Washington, D.C., with him on brief), for petitioners Dimension Financial Corp., Daniel T. Carroll, Harold D. Dufek, William L. Mitchell, Ronald L. Shaffer and A. Gary Shilling.

John D. Hawke, Jr. of Arnold & Porter, Washington, D.C., for petitioners First Bancorporation, Colorado Indus. Bankers Ass'n, Fort Lupton Indus. Bank, Monroe Indus. Bank, Castle Rock Indus. Bank, Ark Valley Indus. Bank, Household Weld County Indus. Bank, Household Lamar Indus. Bank, Household Alamosa Indus. Bank, Household Valley Indus. Bank, Household Salida Indus. Bank, Copper State Thrift & Loan Co., Copper State Financial Corp., and intervenors American Financial Services Ass'n and Household Finance Corp.

Anthony J. Celebrezze, Jr., Atty. Gen., Connie J. Harris, Asst. Atty. Gen., State of Ohio, Columbus, Ohio, filed a brief on behalf of petitioners State of Ohio and Ohio Div. of Sav. and Loan Associations.

Thomas B. Ridgley, Roger A. Yurchuck, Robert W. Minor and Philip A. Brown, of Vorys, Sater, Seymour & Pease, Columbus, Ohio, filed a brief on behalf of petitioners Ohio Deposit Guarantee Fund, Horizon Sav. and Loan Co., Horizon Service Corp. and Permanent Sav. and Loan Ass'n.

James D. Blount, Jr. and John L. Jernigan, of Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, Raleigh, N.C., filed a brief on behalf of petitioner Financial Institutions Assurance Corp.

Richard M. Ashton, Asst. Gen. Counsel, Bd. of Governors of the Federal Reserve System, Washington, D.C. (Richard K. Willard, Acting Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, D.C., Michael Bradfield, Gen. Counsel, Bd. of Governors of the Federal Reserve System,

**1404**

Washington, D.C., with him on the brief), for respondent Bd. of Governors of the Federal Reserve System.

James F. Bell and Arthur E. Wilmarth, Jr., of Jones, Day, Reavis & Pogue, Washington, D.C., filed a brief on behalf of amicus curiae Conference of State Bank Sup'rs.

Before SETH, Chief Judge, and DOYLE and SEYMOUR, Circuit Judges.

SETH, Chief Judge.

This is a Petition for Review of changes made by the Board of Governors of the Federal Reserve System in Regulation Y (12 C.F.R. Part 225—1983) as it defines which financial institutions are "banks" and thus come under the Bank Holding Company Act (12 U.S.C. §§ 1841–50). The acquisition of a "bank" requires prior approval by the Board of Governors and the company which acquires a "bank" becomes a "bank holding company" subject to the Act. A "bank holding company" is a company which has control over any "bank." 12 U.S.C. § 1841(a)(1). What was a "bank" in the original Act depended on its charter. Since the enactment of the Holding Company Act the definition of a "bank" has been narrowed by several statutory changes.

In 1966 the charter test was abandoned and a "bank" was defined as an institution which accepted deposits which "the depositor has a legal right to withdraw on demand." The Board agreed with the change. Then in 1970 the BHCA was amended further to provide that a "bank" was an institution which accepted deposits "which the depositor has a legal right to withdraw on demand" (as before), but added "and engages in the business of making commercial loans." (12 U.S.C. § 1841(c)) The definition was thus narrowed to require that both the deposit and commercial elements must be present to constitute a "bank." It is pursuant to this statutory provision or definitions that the Board argues it proceeded in its changes of Regulation Y with which we are here concerned. The Board's changes redefined the demand and the commercial loan components of the statutory provisions. The statute states what sort of demand deposits are to be used but as to loans only says "engages in the business of making commercial loans."

The new and challenged Regulation Y defines "commercial loans" in 12 C.F.R. part 225, § 225.2:

"(B) 'commercial loans' means any loan other than a loan to an individual for personal, family, household, or charitable purposes, and includes the purchase of retail installment loans or commercial paper, certificates of deposit, bankers' acceptances, and similar money market instruments, the extension of broker call loans, the sale of federal funds, and the deposit of interest-bearing funds."

The challenge by petitioner goes to the inclusion of the "other than" transactions as commercial loans.

The purpose of the Bank Holding Company Act, as amended, is stated in S.Rep. No. 1084, 91st Cong., 2d Sess., *reprinted in* [1970] U.S. Code Cong. & Ad. News 5519, 5541.

This review concerns, with the changes in Regulation Y, both the demand deposit element of the definition in the new Regulation Y and the definition of "commercial loans" therein.

We have considered in *First Bancorporation v. Board of Governors*, 728 F.2d 434 (10th Cir.), the demand deposit aspect in the context of an order directed to one or two institutions and also generally. There would seem to be no need to repeat or add to what was there said and we adhere to that opinion.

The matter of the Board's new and changed view as to what constitutes a "commercial loan" under the 1970 Amendment (the Act) requires some further consideration.

I. "Commercial Loans"

The definition of "commercial loans" since 1970 was developed by regulatory agencies in determinations that particular transactions were *not* commercial loans un-

der the Act. These exclusions have been explained by comparisons with the attributes of transactions generally accepted in the business as commercial loans. The rationalizations are not as important for our purposes as are the conclusions which were reached. This appeal in large part is concerned with money market and interbank transactions which heretofore were not considered to be commercial loans and which are defined as such by changes in Regulation Y.

There is no serious dispute that the term "commercial loan" was in common use and had a generally accepted meaning in 1970 both in the business and by all regulatory authorities, including the Board. There has been no change of this meaning in the business since that time, none evidenced by Congress, and no change by the regulatory agencies except the Board. The Board is thus alone in its new position and this is understandable because it was adopted with no reference to the actual meaning, but instead was adopted purely to carry out a new Board policy—to *stop changes* in the business of providing financial services—thus to bring a large number of additional enterprises under its jurisdiction by a change in definitions and so to accomplish this halt to change. In short, the new definition had nothing to do with the original meaning of the term nor the then current meaning, but instead was a device to accomplish an end—a change in the Board's jurisdiction. It was a device to freeze the changes in the business of financial services until the Board could persuade Congress to act. Congress had theretofore declined to adopt a moratorium proposed by the Board on changes which would also have used new definitions to accomplish the purpose. However, as a practical matter, with the new definitions there was more than a halt. It was to cause pervasive changes, thus to cause existing businesses to suddenly become bank holding companies and to necessitate reversal of acquisitions and to bring about divestitures; to change the investments permitted of state chartered savings and loans; and to have other consequences on existing business. It affected other regulatory agencies. For example, the changes required federal deposit insurance for entities which had insurance under state funds and other funds. It required entities to obtain such insurance which were not eligible for it. In short, the changes in definitions and the jurisdiction of the Board would cause extensive changes by other agencies and of course by some entities providing financial services to the public.

II. The Board since 1970 has taken a position on the relation of the Bank Holding Company Act to institutions engaging in all significant money market and interbank transactions. In each instance before 1982 the opinion or advice or ruling was that the transaction was not a commercial loan under the Act. Thus in a 1972 letter to the Federal Reserve Bank of Boston the Board, in reference to the Boston Safe Deposit Company, stated the sale of federal funds was not a commercial loan under the Act nor was the purchase of bankers' acceptances, certificates of deposit, or commercial paper. In 1976 the Board ruled that broker call loans were a passive medium of investment with no close lender-borrower relationship as existed with commercial loans under the Act. In 1980 the Board's Legal Division in a letter to the Federal Reserve Bank of Boston stated that the purchase on the secondary market of the guaranteed segment of SBH and Farmer's Home loans was not commercial lending.

In 1981 an internal memorandum (February 10, 1981) stated that the purchase of money market funds including certificates of deposit, bankers' acceptances and commercial paper were not commercial loans, nor were the purchases of federal funds nor were brokers' call loans commercial loans under the Act.

Later in 1981 the Board again evidenced the existence of its position expressed in the instances referred to above. In this transaction Associates First Capital Corporation purchased the Fidelity National Bank of Concord, California. Associates Corporation was owned by Gulf & West-

ern, a nonbank corporation. The bank divested itself of its commercial loans. However, it remained in the money market and engaged in interbank transactions and the Board was of the view that these did not constitute commercial loans and Fidelity was not a "bank" under the Act.

What may fairly be described as the consistent policy or position of the Board described briefly above came to an end in December 1982. The Dreyfus Corporation considered the purchase of a nonmember state bank (Lincoln) insured by the FDIC. The proposal was to have the bank cease making commercial loans and to have it divest itself of such existing loans. The Board responded that Lincoln would nevertheless be a "bank" under the Act because in the Act the term "commercial loans" included the purchase of

> "commercial paper, bankers acceptances, and certificates of deposit, the extension of broker call loans, the sale of federal funds, the deposit of interest bearing funds and similar lending vehicles."

In Dreyfus the FDIC disagreed with the new position of the Board and permitted the acquisition of Lincoln under the conditions described. The FDIC in a letter of December 29, 1982 from the Deputy Chairman commented that the Board had "dramatically re-cast the definition of commercial loan," and the FDIC "was constrained to follow the clear legal precedents established over the years," and further commented that a change as expressed by the Board should be brought to the attention of Congress and not handled by agency action.

Also in Dreyfus the Comptroller as to a separate charter application stated "that the inclusion of money market transactions within the BHCA term 'commercial loans' is not supported by the purpose or the legislative history of the BHCA," and referred to the Boston Safe matter. The Comptroller described as the money market transactions referred to were essentially a passive medium of investment and involved no close lender-borrower relationship and

thus did not constitute a threat of the abuse sought to be met by the Act.

The Board Dreyfus letter (December 1982) was followed in May of 1983 by the Board's notice of the proposed changes in Regulation Y here considered. The changes by Regulation Y must be characterized as a complete "reversal" of the Board's previous position. The change was from white to black, from no to yes. It was not a modification or variation on the previous position nor did it seek to fill in some sort of gap. Money market transactions on one day were not commercial loans and the next day they were. This in itself does not sound so drastic, but the consequences sought to be visited thereby on a variety of financial institutions and their long-standing relationships and the regulatory authorities were indeed drastic. No party contends that the new definition is in accord with common usage.

III. The purpose of the reversal of position by the Board was, as already described, to stop the changes which were proceeding at a fast pace in businesses providing financial services. In order for the reversal to be effective the Board's authority had to be and was expanded to include institutions not theretofore within its jurisdiction as to all, or as to substantial parts of their activities. As also mentioned, this expansion of jurisdiction was very much more than just the prevention of future acquisitions, arrangements or affiliations. It was to cause divestitures of old acquisitions, sale of assets, changes in permitted uses of excess funds by state chartered and other institutions. It also was to have a drastic impact on many other types of business arrangements and on the way business was conducted, who could insure deposits and changes in regulatory authority from states to the "feds."

Such a complete change and one which is a redefinition and expansion of jurisdiction by an agency requires that different standards be met than are demanded in a typical administrative redefinition not involving such elements.

One additional factor present here is the reason why the change was made. The departure from the accepted meaning or general usage prevailing at the time Congress passed the Act was not a consequence of any original error; nor of any change in trade usage; nor as a result of any signal from Congress; nor to coincide with the views of other regulatory agencies. Instead the change was to provide, by an expansion of jurisdiction, a regulatory device to change the course of the development of financial institutions which had taken place in conformance with the Act as construed by the Board from the outset. The Board since 1970 thus gave strong signals as to the definitions which created exceptions to the Act. The Gulf & Western decision was one of several such signals.

The new kinds of institutions which grew in number under the statutory-administrative provisions were well within the permitted exceptions, some formally approved, and cannot be considered as departures nor as evasions of the Act. A permitted exception cannot now be classified as an evasion as the Board would argue.

IV. The Act itself with the clearly expressed definitions permitted the development of the non-bank banks. The exceptions created by the definitions were based on industry usage, as mentioned, and contemplated that *some* institutions would not be included. An example is Boston Safe which was brought to the attention of the Senate by Mr. Robertson, head of the Board. The Board obviously knew what Boston Safe was doing. The statute thus anticipated exceptions, but apparently no one anticipated that the pressure for change in financial services would be as great and the business so volatile as it was in the years following. The problem has come not from the scope of the intended exceptions nor from the validity of the definitions, but from the prediction as to the numbers or volume within the exceptions. A prediction which probably no one could have accurately made, and the resulting problem, if it is that, could have been (or could be) resolved only by Congress should it perceive a need to act as in 1956, 1966 and 1970.

The changes which have come about cannot be characterized as "evasions" of the Act. The entities have followed the Act, and have followed the interpretation by the agency. There is nothing before us to indicate any violations of the regulations, and the Board has pointed out none. Early on in Boston Safe a strong signal was given as to what was permissible, and as late as Gulf & Western the Board demonstrated what still could be done. It is difficult to understand how the latter could be characterized as an "evasion."

V. Legislative History

The legislative history of the 1970 Amendment contains an unusual and significant element. This is again the Boston Safe Deposit & Trust Co. application which was apparently pending at the time the Senate was considering the 1970 Amendment (the Act). To repeat, Mr. Robertson of the Board then advised the Senate committee that the 1970 Amendment would have a limited impact and this would "include" the Boston Safe Deposit & Trust Co. This "impact" was the fact that Boston Safe would not be a "bank" as it would be excluded by the term "commercial loans" in the Act. The Board, of course, knew of the transactions Boston Safe sought to engage in (or was then engaging in), and these were demand deposits and the typical money market and interbank transactions. It apparently also assumed that the Senate committee also knew. These as described above were then not considered in the business as "commercial loans." The Board stated that it did not consider them as included in the term "commercial loans" and so advised the Senate committee. To repeat, the Board was of the view that Boston Safe was not a bank.

It seems to have been agreed that the 1966 definition of a "bank" was too broad and to narrow the exceptions some reference to loans should be made. In S.Rep. No. 1084, 91st Cong., 2d Sess., *reprinted in* [1970] U.S. Code Cong. & Ad. News

5519, 5541, the Senate committee indicated that the then existing definition was intended "to include commercial banks and exclude those institutions not engaged in commercial banking" as the Bank Holding Company Act was designed to prevent the misuse of commercial bank credit and the concentration of control over commercial banks. The Board then agreed that the 1966 definition might include institutions which were not in the commercial banking business—that is did not make commercial loans. The 1970 Amendment thus excluded financial businesses which did not make such loans.

There can really be no serious dispute but that the term "commercial loans" as used in the banking business when the Act was adopted did not include the purchase of money market transactions nor certificates of deposit nor did it include interbank transactions.

The position taken by several of the Federal Reserve Banks and by the FDIC and the Comptroller contrary to that of the Board, and the reasons such regulatory agencies have expressed, demonstrate the accepted meaning then and now of the term "commercial loans."

The purchases added by the Board are for the most part open market transactions—purchases on a secondary market—where prices are set not by the parties but by all market transactions. The Board has shown no facts which would show abuses contemplated by the BHCA in commercial banking by those engaging in money market transactions.

VI. The Board under the BHC Act has authority to make rules and regulations. Under Section 5(b) of the Act (12 U.S.C. § 1844(b)) the Board is authorized to issue orders and regulations "as may be necessary to enable it to administer and carry out the purposes of this chapter and to prevent evasions thereof."

■ The authority of the Board under the Act is to be exercised in a restricted area. It does not have the broad scope to work in as do many other agencies. There is not present a "public good" or "public benefit" provision. Instead, the BHCA limits the subject matter of the Board's functions basically to anticompetitive considerations.

This matter was discussed by this court in *Western Bancshares, Inc. v. Board*, 480 F.2d 749 (10th Cir.), where the Board had disapproved an acquisition because the same price was not paid for all shares. We there referred to the "express factors" in the Act:

"Rather, the thrust of the 1970 amendments is designed to more adequately protect against abuses which may be of future concern on the part of previously exempt one-bank holding companies in addition to certain modifications relating to companies controlling more than one bank. These possible abuses or future concerns related to monopolistic practices, lessening of competition and extension of a line of credit to finance an unrelated business concern over which it had control. By bringing the one-bank parent holding company within the Act, Congress expressed concern only that the Board be allowed to exercise control relating to the express factors above referred to and management policies of the bank in meeting the public need and convenience.

. . . .

". . . The selective process of the Board in relying upon the broad maxim or reference to the 'public interest' lends no aid, and in fact blends with confusion in the decisional process here involved. Congress *did not* isolate the terms to fit the Board's fancy. It spelled out the specific factors to be considered by the Board relating thereto. . . . We are not dealing in the broad spectrum of administrative policy delegated by Congress to an agency determinative of 'public interest, convenience, and necessity.' *Public Utilities Commission of the District of Columbia v. Pollak*, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). Issues as to the reasonableness or inequality of stock purchases must be decided upon the basis of the law of contracts, or such

other principles of law as may be applied in a forum competent to adjudicate the issue between the parties thereto. Contemporaneous construction of a statute by an agency charged with its enforcement is entitled to great deference by the courts. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). But we are not bound thereby, and particularly so where neither the Act nor the legislative history contains one word expressly permitting the administrative authority assumed." (Emphasis in original.)

The court in *Patagonia Corporation v. Board*, 517 F.2d 803 (9th Cir.), considered a prior position taken by the Board on other applications, and said:

"These inconsistent prior adjudications, which are among the very few previous examples of the Board's prior consideration of the controlling influence tests, indicate that the position that the Board advances with respect to Patagonia is not the type of consistent, clearly articulated administrative interpretation of a statute with which the courts are generally reluctant to interfere."

Also of significance the court in *Patagonia* also considered the narrow scope of the Board's function and of this said:

"It is of interest to note that under the Act, the Board's administrative mandate is not open ended. Congress did not write the Act in general terms, thus leaving extensive areas of law to be developed by the Board. Rather, the Board is charged with responsibility for administering relatively specific statutory provisions. See *Western Bancshares, Inc. v. Board of Governors*, 480 F.2d 749, 753–54 (10th Cir.1973); 15 B.C. Ind. & Com.L. Rev. 369 (1973). Congress surely did not intend that the Board would be empowered to expand or constrict the statutory definition of 'subsidiary' or the grandfather proviso, the scope of which Congress carefully considered, in accordance with the Board's conception of regulatory needs. That the Board's mandate under the Act is relatively circumscribed is also relevant in determining the extent

to which courts must defer to the Board's interpretation of the Act."

In *Garvey v. Freeman*, 397 F.2d 600 (10th Cir.), this court considered administrative interpretations and we there quoted from *Stark v. Wickard*, 321 U.S. 288, 309–310, 64 S.Ct. 559, 571, 88 L.Ed. 733, as follows:

" 'When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. * * * The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction.' "

The Supreme Court in *Board of Governors v. First Lincolnwood Corp.*, 439 U.S. 234, 99 S.Ct. 505, 58 L.Ed.2d 484, in the application of a financial soundness test found specific statutory authority for the Board's act. The Third Circuit in *Wilshire Oil Co. v. Board of Governors*, 668 F.2d 732, considered an obvious attempt, by changes in terms of demand deposits, to evade the Act's definition of deposits. This represents a significant decision on evasions of specific provisions of the Act.

■ There is a related doctrine which must be considered when an agency radically changes its position on statutory construction. In such circumstances the agency must clearly articulate the basis for the change. This is not only an aspect of any procedural notice requirement in rulemaking but is a substantive need. The Supreme Court in *Motor Vehicle Manufacturers v. State Farm*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443, mentions this requirement. The articulated facts must show a purpose for the change well within the agency authority.

■ It is, of course, necessary that the regulatory authorities be able to change to meet new conditions arising within their sphere of authority *and* for a purpose or to

accomplish a result within their authority. The Court in *American Trucking, Inc. v. AT & SF R. Co.*, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847, very clearly enunciated this proposition.

■ VII. The doctrine which accords deference to regulatory agencies in their implementation of statutory provisions has been thoroughly developed and needs no discussion here. This court has recognized it as quoted herein and we do so now. The application of the doctrine assumes that the regulatory authority is acting on a matter within the subject matter scope of its statutory duties. It also assumes that the action has been taken to carry out the particular purpose of the statute and not to meet other conditions, related or not, that the agency decides should be changed or regulated. Instead, such action requires a change in the jurisdiction of the agency by Congress.

It must be recognized that the statute here concerned is of very narrow scope and the Board necessarily operates within these limitations. Likewise the statute has a clearly recognized purpose and again the actions of the Board are confined to the accomplishment of this purpose. "Expertise" in this context can only mean the skill and experience of the agency within its proper scope of activity.

We cannot hold that the limited authority of the Board permits it to itself bring about the change here attempted and a change in its own jurisdiction no matter how necessary it perceives the change to be, and no matter how serious it may consider the inaction of Congress to be in the face of the growth of financial institutions presently outside the Board's statutory jurisdiction.

We are concerned about the positions contrary to that taken by the Board expressed by the Comptroller of the Currency and the Federal Deposit Insurance Corporation which are regulatory agencies in the same field and with some overlapping functions. We also note the contrary views of several regional Federal Reserve Banks. The Federal Reserve Bank of Atlanta stat-

ed as to changes in the Board's position, "Since the new definition of commercial loans has no basis in tradition or in the BHC Act it appears to provide an overly broad extension of the regulation." The Federal Reserve Bank of San Francisco stated it was "not convinced that the Board's expansive reading of 'bank' is justified, or that Congress intended that so-called 'nonbank banks' be subject to Board authority under the Bank Holding Company Act." The Federal Reserve Bank of Chicago expressed a similar view.

VIII. It does not appear necessary to discuss how the assertion of authority to control the use of excess or investment funds will affect state institutions. We do not comment on the distinctions made between NOW accounts and demand deposits in the Garn-St. Germain Act (Pub.L. No. 97–320), nor do we feel it necessary to discuss the Douglas Amendment although it is a significant factor in the mix of state and federal regulation.

The possible exception to the initial impact of Regulation Y (Part 225.21(B)(4)) contains requirements with no objective standard and completely with agency discretion. This as a device to meet objections to the new regulation cannot cure the exercise of powers denied by Congress or not provided for by Congress. *Public Utilities Comm. of Calif. v. United States*, 355 U.S. 534; 78 S.Ct. 446, 2 L.Ed.2d 470; *In re Surface Mining Regulation Litigation*, 627 F.2d 1346 (D.C.Cir.).

The Act expressly requires the Board to annually make recommendations to Congress as to changes in the law which it feels desirable. 12 U.S.C. § 1844(d).

We have carefully considered the Appendix which accompanied the changed Regulation Y when it was issued. It contains the Board's view of the need for changes and states the Board's conclusions as to several conditions it perceived to exist.

The petitioner asserts that facts were not presented in advance of the adoption of the changes to an extent that any meaningful comments could be made as required by

the APA. *See Texaco, Inc. v. F.P.C.*, 412 F.2d 740 (3d Cir.), and thus faults the adoption of the changes. We, however, express no opinion on this point.

As mentioned at the outset, there would seem to be no need to again cover the demand deposit element in the changes. We decided this matter in *First Bancorporation v. Board of Governors*, 728 F.2d 434 (10th Cir.). We abide by that decision which is fully applicable to the same issue now before us again.

■ The order and rule of the Board adopted on December 29, 1983 which amended the then existing Regulation Y (12 C.F.R. Part 225—1983) are hereby set aside. IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Board shall not attempt to enforce or implement such changes herein held invalid. The mandate shall issue in the usual manner.