**FLORIDA DEPARTMENT OF BANKING AND FINANCE, Petitioner,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.**

**FLORIDA BANKERS ASSOCIATION, and Sun Bank/Palm Beach, Petitioners,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.**

Nos. 84–3269, 84–3270.

United States Court of Appeals, Eleventh Circuit.

May 20, 1985.

S. Craig Kiser, Carl B. Morstadt, Fla. Dept. of Banking & Finance, Tallahassee, Fla., for petitioner.

James F. Bell, Jones, Day, Beavis & Pogue, Arthur E. Wilmarth, Jr., Washington, D.C., for intervenor-petitioner.

James A. Michaels, Richard M. Ashton, Office of Gen. Counsel, Bd. of Governors of Federal Reserve System, Washington, D.C., for respondent.

Bowman Brown, Shutts & Bowen, Miami, Fla., Vaughn C. Williams, Skadden, Arps, Slate, Meagher & Flem, New York City, for intervenor-respondent.

On Review of an Order of the Board of Governors of the Federal Reserve System

Before RONEY and TJOFLAT, Circuit Judges, and BROWN\*, Senior Circuit Judge.

---

\* Honorable John R. Brown, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. The order was dated March 23, 1984.

2. Notwithstanding any other provision of this section, no application (except an application filed as a result of a transaction authorized under section 1823(f) of this title) shall be approved under this section which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside of the State in which the operations of such bank holding company's bank-

JOHN R. BROWN, Circuit Judge:

### I. *Overview*

This action is a petition, pursuant to 12 U.S.C. § 1848, for review of an order of the Board of Governors of the Federal Reserve System (the Board). In its order,[1] the Board, acting pursuant to the Bank Holding Company Act of 1956 (as amended), 12 U.S.C. § 1841 *et seq.*, approved the application of a New York bank holding company, U.S. Trust, to expand the nonbanking activities of its wholly owned Florida subsidiary (Trust Company).

### II. *The Legislative Framework*

The Bank Holding Company Act (the Act) constitutes a comprehensive federal framework for the supervision and regulation of bank holding companies—companies that control one or more banks. Section 2(c) of the Act contains the statutory definition of "bank." Bank is defined as any institution that: (1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans. 12 U.S.C. § 1841(c). Section 3 of the Act deals with a bank holding company's acquisition of banks. 12 U.S.C. § 1842(a). Under this section, a bank holding company may not acquire control of any additional bank without prior approval of the Board. Section 3(d) of the Act,[2] commonly referred to as the "Douglas Amendment," prohibits the Board from approving the acquisition of any bank by a bank holding company whose principal operations are conducted in another state, unless the acquisition of the bank by an out-of-state bank holding com-

ing subsidiaries were principally conducted on July 1, 1966, or the date on which such company became a bank holding company, whichever is later, unless the acquisition of such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication. For the purposes of this section, the State in which the operations of a bank holding company's subsidiaries are principally conducted is that State in which total deposits of all such banking subsidiaries are largest.

pany is expressly authorized by the statute laws of the state in which the bank to be acquired is located. 12 U.S.C. § 1842(d). In other words, the Douglas Amendment proscribes interstate bank acquisitions by bank holding companies unless the state where the bank to be acquired allows such acquisitions by statute. Section 4 of the Act deals with the regulation of nonbank activities. Section 4 generally prohibits a bank holding company from acquiring an entity engaged in nonbank activity. Section 4(c)(8) of the Act contains the principal exception to this prohibition. It authorizes board approval of acquisitions of nonbanking activities which are "closely related" to and a "proper incident" of banking. Section 5 of the Act confers certain enforcement powers upon the Board. Specifically, § 5(b), 12 U.S.C. § 1844(b), authorizes the Board to issue regulations and orders to carry out the purposes of the Act and to prevent evasions of it.

### III. *The U.S. Trust Application*

U.S. Trust is a bank holding company whose sole commercial bank subsidiary is located in New York, New York. On November 8, 1983, U.S. Trust applied for the Board's approval of a proposal to expand the nonbanking activities of its nonbanking subsidiary in Florida. The proposed expansion included the acceptance of time and demand deposits (including checking accounts) and the making of consumer loans. U.S. Trust's Florida subsidiary had previously been established as a Florida chartered nondeposit trust company. This subsidiary had provided fiduciary, investment, advisory, and custody services to its clients in Palm Beach, Florida. In May of 1984, U.S. Trust completed the conversion of its state chartered trust subsidiary into a national association, called Trust Company. It is now U.S. Trust's only subsidiary in Florida. Trust Company continues to provide the above mentioned trust services, as well as the services now authorized by the Board's order. This conversion occurred with the approval of the United States Comptroller of the Currency. Specifically,

the Comptroller approved the conversion of Trust Company into a nonbank on the express condition that Trust Company "not engage in the business of making commercial loans."

### IV. *Action of the Board*

After the Board issued public notice of U.S. Trust's application, the Florida Department of Banking and Finance, the Florida Bankers Association, and the Sun Bank/Palm Beach filed comments and requested that the Board conduct a hearing on the U.S. Trust application.[3]

The Board issued its order approving U.S. Trust's application for Trust Company to operate as a nonbank on March 23, 1984. That order specified several conditions for approval of the application. U.S. Trust was ordered to not:

(1) operate Trust Company's demand deposit-taking activities in tandem with any other subsidiary or other financial institutions;

(2) link in any way the demand deposit and commercial lending services that define a bank under the Act; and

(3) have Trust Company engage in any transactions with affiliates, other than the payment of dividends to U.S. Trust or the infusion of capital by U.S. Trust into Trust Company, without the Board's approval.

Since these conditions precluded Trust Company from engaging in commercial lending, the Board found that Trust Company was not a "bank" within the meaning of Section 2(c) of the Act. The Board's order lamented that although "approval of this proposal presents a serious potential for undermining the policies of the Act, the Board is constrained by the definition of bank in the Act to approve the application." The Board further rejected the petitioners' request for an evidentiary hearing, deeming the issues in the application to be legal in nature not warranting a hearing on factual issues. All of petitioners' requests for reconsideration were denied by the Board. The Board also refused to stay its order.

---

**3.** These parties will be collectively referred to as     petitioners.

Although it sanctioned the U.S. Trust application, the Board was plainly unenthusiastic about the course it was adopting. The order itself contained a plea for Congressional action because:

> if the nonbank concept, particularly as expanded by the interpretation of demand deposit adopted by the Tenth Circuit,[4] becomes broadly generalized, a bank holding company or commercial or industrial company, through exploitation of an unintended loophole, could operate "banks" that offer NOW accounts and make commercial loans in every state, thus defeating congressional policies on commingling of banking and commerce, conflicts of interest, concentration of resources and excessive risk, or with respect to limitations on interstate banking. Congressional action thus is urgently needed to ensure that the policies of the Act are maintained. In this regard, the Board does not believe that any public policy would be served by grandfathering proposals such as this that occur subsequent to the introduction of legislation that would otherwise prohibit such transactions.

Thus, the Board, in the very order granting U.S. Trust's application, emphasized its prior opinions that "an institution that is chartered as a bank and that accepts transaction accounts from the public should be subject to the policies that Congress has established for banks in the BHC Act." Order at 3. *See* Citizens Fidelity Corp., 69 Federal Reserve Bulletin 556 (1983); Citicorp, 70 Federal Reserve Bulletin 921 (1984); Mellon National Corp., 70 Federal Reserve Bulletin 441 (1984).

## V. *Appeal to the Eleventh Circuit*

On April 23, 1984, the Florida Department of Bank and Finance petitioned us for review of the Board's order. The Florida Bankers Association and Sun Bank/Palm Beach filed similar petitions. U.S. Trust and the Conference of State Bank Supervisors then filed motions to intervene as a respondent and as a petitioner, respectively. We granted these motions.

## VI. *Decision*

On its face, this appeal involves nothing more than a question of statutory interpretation. To state our problem so simply, however, is to belie its complexity. As we write, an avalanche of applications by bank holding companies seeking to establish hundreds of deposit-taking institutions across state lines is in progress.

■ The Board and U.S. Trust believe Congress' definition of a bank to be clear. They would have us rely on the well established principle of statutory construction that an agency or court cannot modify the clear language of a statutory provision. *See, e.g., American Tobacco Company v. Patterson,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982); *Central Trust Company v. Official Creditors Committee,* 454 U.S. 354, 102 S.Ct. 695, 70 L.Ed.2d 542 (1982). Petitioners counter with the equally well established rule of statutory interpretation that courts ought not to apply the literal terms of a statute to reach a result contrary to the underlying policy of Congress. They rely on the many reported decisions where courts have gone beyond the face of the statute to ascertain congressional intent and purpose. *See, e.g., United States v. American Trucking Association,* 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940);[5] 2A Sutherland, *Stat-*

---

4. *First Bancorporation v. Board of Governors,* 728 F.2d 434 (10th Cir.1984). The board is seeking a rehearing of this case—which involved the issue of whether a negotiable order of withdrawal (Now) account was a demand deposit for purposes of the Act—before the Tenth Circuit.

5. There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even *when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose,*

*utes and Statutory Construction,* § 46.07 (C. Sands 4th ed. 1973).

In its order, the Board concluded that the Act's definition of bank in § 2(c) did not permit a more expansive interpretation on which to deny the U.S. Trust application. In effect, the Board was persuaded to approve the U.S. Trust application by the argument that the Act is a comprehensive regulation of the banking industry with carefully defined terms. The Board was reluctant to look through the definition of bank to see the substance of the U.S. Trust application. Although we believe the words used by Congress to define bank to be clear in the sense that a meaning is intelligible, that is not tantamount to a decision that we should inquire no further. Literalism in statutory interpretation, when it is contrary to an express purpose of the Act, cannot be a talisman.

(a) *The Changing Definition of Bank*

Congress twice has amended the Act's definition of bank prior to the present controversy. In each prior case, the legislative history leaves no doubt that the purpose of the amendment was to delineate more clearly which institutions would be subject to regulation under the Act in light of the Board's experiences with regulation. The original 1956 Act defined bank in terms of the charter of the entity. This first definition included "any national banking association or state bank, savings bank, or trust company."[6] Chapter 240, § 2(c),

70 Statutes 133. In 1966 Congress amended the Act to provide a narrower definition of bank. This definition included only institutions "that accept deposits payable on demand."[7] This amendment was specifically intended to exclude savings and industrial banks, thus leaving only commercial banks subject to the Board's regulation.[8] As the Senate report stated, the deposit test has long been the accepted definition of what constitutes a commercial bank.

Section 2(c) of the Act [i.e. prior to its amendment in 1966] defines "bank" to include savings banks and trust companies, as well as commercial banks. The purpose of the Act was to restrain undue concentration of control of commercial bank credit, and to prevent abuse by a holding company of its control over this type of credit for the benefit of its non-banking subsidiaries. This objective can be achieved without applying the Act to savings banks, and there are at least a few instances in which the reference to "savings bank" in the present definition may result in covering companies that control two or more industrial banks. *To avoid this result, the bill redefines "bank" as an institution that accepts deposits payable on demand (checking accounts), the commonly accepted test of whether an institution is a commercial bank so as to exclude institutions like industrial banks and nondeposit trust companies.*

---

*rather than the literal words.* (emphasis supplied).

**6.** (c) "Bank" means any national banking association or any State bank, savings bank, or trust company, but shall not include any organization operating under sections 611 and 612 of this title, or any organization which does not do business within the United States. "State member bank" means any State bank which is a member of the Federal Reserve System. "District bank" means any State bank organized or operating under the Code of Law for the District of Columbia.

**7.** (c) "Bank" means any institution that accepts deposits that the depositor has a legal right to withdraw on demand, but shall not include any organization operating under section 25 or section 25(a) of the Federal Reserve

Act, or any organization that does not do business within the United States. "District bank" means any bank organized or operating under the Code of Law for the District of Columbia.

**8.** Savings banks are financial institutions organized historically "to encourage thrift among persons of modest means by paying interest dividends on savings deposited therein." G.G. Munn, Encyclopedia of Banking and Finance (8th ed.), 852. Industrial banks are those institutions which are chartered by state law to extend installment credit to consumers and to accept some form of savings deposit or sell investment certificates or certificates of deposit as a means of financing the operation. *See* Industrial Banks as Thrift Institutions, American Financial Service Association Research Report (1982).

Senate Report No. 1179, 89th Cong., 2d Sess. 7, reprinted in 1966 U.S.Code Cong. & Adm.News 2385, 2391. (emphasis added)

In 1970, Congress again amended the Act's definition of bank.[9] This amendment, which is the definition presently before us, added the requirement that an entity make commercial loans, as well as accept demand deposits, to be a bank. 12 U.S.C. § 1841(c)(2), Public Law No. 91–607, § 101(c), 84 Statutes 1762 (1970). The Report of the Senate Committee on Banking and Currency explained the 1970 amendment as follows:

> The definition of "bank" adopted by Congress in 1966 was designed to include commercial banks and exclude those institutions not engaged in commercial banking, since the purpose of the Act was to restrain undue concentration of commercial banking resources and to prevent possible abuses related to the control of commercial credit. However,

**9.** (c) *"Bank"* means any institution organized under the laws of the United States, any State of the United States, the District of Columbia, any territory of the United States, Puerto Rico, Guam, American Samoa, or the Virgin Islands, except an institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation or an institution chartered by the Federal Home Loan Bank Board, which (1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans. Such term does not include any organization operating under section 25 or section 25(a) of the Federal Reserve Act, or any organization which does not do business within the United States except as an incident to its activities outside the United States. "District bank" means any bank organized or operating under the Code of Law for the District of Columbia. The term "bank" also includes a State chartered bank or a national banking association which is owned exclusively (except to the extent directors' qualifying shares are required by law) by other depository institutions or by a bank holding company which is owned exclusively by other depository institutions and is organized to engage exclusively in providing services for other depository institutions and their officers, directors, and employees.

**10.** Specifically, in response to an inquiry from the Senate Committee on Banking and Currency, Governor Robertson of the Board advised:

the Federal Reserve Board has noted that this definition may be too broad and may include institutions which are not in fact engaged in the business of commercial banking in that they do not make commercial loans. The committee, accordingly, adopted a provision which would exclude institutions that are not engaged in the business of making commercial loans from the definition of "bank."

Senate Report No. 1084, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Ad.News 5519, 5541. Crucial to an understanding of our present problem is the widespread impression throughout Congress that the 1970 amendment was predicted to have an extremely narrow impact. As the legislative history reveals, in 1970 there was only one significant financial institution, the Boston Safe Deposit and Trust Company, that accepted demand deposits but made no commercial loans.[10]

> *[T]his amendment would have very limited application at present, possibly affecting only one institution.* Since there is less need for concern about preferential treatment in extending credit where no commercial loans are involved, and in view of the very limited application of this amendment, the Board would have no objection to its adoption.
> *One-Bank Holding Company Legislation of 1970: Hearings on S.1052, et al. before the Senate Comm. on Banking and Currency,* 91st Cong., 2d Sess., 136–37 (1970) (emphasis added). The one institution affected by the amendment was the Boston Safe Deposit and Trust Company, evidently the only bank at the time which accepted demand deposits but engaged in no commercial lending. *See* 116 Cong.Rec. 25848 (1970) (remarks of Representative Gonzalez).

Indeed, the redefinition of bank can be seen as a bit of local favoritism on the part of Senator Brook of Massachusetts. The two part definition appeared to exempt a valued local institution without affecting other commercial banks. This redefinition of bank brings to mind Congress' action when dealing with the Dupont Trust in Florida as it originally passed the Act in 1956. The trust, which owned several banks and thus would have come under the regulation of the Board, received a narrowly tailored exception for charitable trusts and was exempted from the original scope of the Act. As the Senate Report discussing abolition of the trust exemption makes clear, No. 1179, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Ad.News 2385, 2387–88:

### (b) *The Purpose of the Act*

■ The legislative history reveals that Congress had three purposes in adopting the Act in 1956. The first two, which the Board and U.S. Trust acknowledge, were to prevent bank holding companies from (1) acquiring additional banks in a manner which would concentrate banking facilities within a particular area, and (2) combining under single control both banking and non-banking enterprises in a manner which would enable holding companies to use bank deposits to finance unrelated non-banking activities. It seems to us, however, that the Board and U.S. Trust ignore the third purpose of Congress, namely, to prohibit the creation of interstate deposit-taking networks by bank holding companies without specific state authorization.

Congress' desire to prevent bank holding companies from acquiring deposit-taking banks across state lines without state authorization was expressed dramatically in its adoption of the Douglas amendment.[11] That amendment, which remains essentially unaltered since the passage of the original Act, was designed to place federal power on the side of state control over banking. The Douglas amendment made the expansion of banking in a state by out-of-state bank holding companies subject to that state's direct and express approval. Such federal deference to state policies was made clear by Senator Douglas when he likened his amendment to the McFadden Act, 12 U.S.C. § 36. In the McFadden Act Congress prohibited national banks from establishing interstate branches (defined as any facilities which receive deposits or pay-checks or make loans) unless state law expressly permitted state banks to establish intrastate branches.

■ With our examination of Congress' goals in adopting the Act behind us, we now consider the question of whether it is reasonable to conclude that Congress intended in 1970 to destroy the Douglas Amendment by adopting an amendment to the definition of bank which would permit bank holding companies to establish an unlimited number of deposit-taking banks across state lines without state approval. Merely to articulate this question in the light of the traditional Congressional concern that banking be subject to the local goals and policies of the states demonstrates the unreasonableness of the U.S. Trust position. We cannot persuade ourselves to employ literalism in statutory interpretation in order to bootstrap Congress' technical amendment of the definition of bank—after being told that the amendment would apply to only a single institution[12]—into a total emasculation of the long held policy giving states control over bank expansion. State control over banking, and the expansion and availability of branches, has been the consistent policy of Congress since passage of the Act in 1956. Viewed in historical perspective, state control over banking has been an important issue in American politics since the charter of the First Bank of the United States.[13]

The principal entity which now receives the benefit of the exemption for long-term trusts and which in the course of time would become a charitable institution is the Alfred I. du Pont trust fund, created under the will of the late Alfred I. du Pont. This is a perpetual testamentary trust under which the testator's widow was left virtually all of the income during her life subject to annuities, and thereafter the entire income would be payable to the Nemours Foundation, a charitable institution primarily for the benefit of crippled children. A 12-percent share of the life tenant's income has been irrevocably assigned to the Nemours Foundation.
The DuPont trust controlled 30 banks in Florida, together with sizeable nonbank businesses.

Thus, technical amendments to favor specific limited local interests have had a place in the Act since its original passage.

11. *See* footnote 2.

12. *See* footnote 8.

13. Dispute over control of banking reached a crisis in Andrew Jackson's war on the recharter of the Bank of the United States. Even though historians have viewed Nicholas Biddle as a good, if somewhat despotic President of the Bank, and Andrew Jackson's precipitous withdrawal of federal moneys from the bank as instrumental in bringing on a nationwide panic, the war for recharter was in reality an extended

There is no dispute that U.S. Trust will accept demand deposits and would therefore be a commercial bank within the commonly accepted test set forth in the 1966 amendment to the definition of bank. For Congress to have completely reversed its field only four years later and to have decided that all commercial banks accepting demand deposits would no longer be subject to the strictures of the Douglas amendment unless they also made commercial loans indicates a dramatic change of heart. Such a change of heart is usually accompanied by protracted debate in Congress. Indeed, the *raison' d'etre* of legislative history is to illumine such shifts in thinking on the part of Congress. However, not even U.S. Trust, let alone the Board, can glean from the legislative history of the 1970 amendment to § 2(c) such a change in congressional intent.

We are reluctant to attribute to a technical amendment, in the absence of compelling legislative history, Congress' intention to abandon a central part of the policies leading to the passage of the 1956 Act. Without such expression on the part of Congress, the wholesale expansion of deposit-taking institutions across state lines cannot be justified in violation of the Douglas amendment. The more reasonable interpretation of the 1970 amendment is that Congress intended to exempt, much like it did with the Dupont Trust in 1956,[14] a single intrastate institution—or perhaps

the very few entities similarly situated—which could be excluded from regulation under the Act without giving rise to the kind of abuses which the Douglas amendment was designed to prevent.[15]

To have us avoid consideration of the Douglas amendment, and its policy of state control over bank expansion, U.S. Trust and the Board focus on § 4(c)(8), which permits bank holding companies to acquire nonbanking activities that are closely related to banking. They argue that Congress' purpose in passing this provision was "to permit the introduction of new innovative competitive vigor into those markets which would benefit therefrom." House Report No. 1747, 91st Cong., 2d Sess. reprinted in 1970 U.S.Code Cong. & Ad.News 5561, 5568. U.S. Trust would have us rely upon the conclusion in the Board's opinion that "there is no evidence that consummation of this proposal would result in any conflicts of interest, unsound banking practices, or other adverse effects." Such a conclusion on the part of the Board must be tempered by an understanding that the majority of the Board voted to approve the U.S. Trust application because of their belief that they were constrained to do so by the literal definition of bank. As the dissent clearly stated:

    although the majority feels compelled to approve the application on grounds that

---

debate over who would control banking. Jackson sided with state control by placing federal deposits in state chartered banks. Biddle's monster bank was slain since neither Clay nor Webster were able to ride the bank issue into the White House.

From that time until the passage of modern banking legislation in this century, the federal government has not used its power to permit uncontrolled expansion by banks. Indeed, as above mentioned, it was precisely the development of the bank holding company—with the concern this phenomena generated about the concentration of financial power—that led to passage of the Bank Holding Company Act of 1956. Congress rendered state control over bank expansion explicit in the 1956 Act when it adopted the Douglas Amendment.

**14.** *See* footnote 8.

**15.** We are aware, of course, that the Tenth Circuit Court of Appeals in its recent decision in *Dimension Financial Corp. v. Board of Governors of the Federal Reserve System*, 744 F.2d 1402 (10th Cir.1984), has concluded the 1970 amendment to § 2(c) "permitted the development of the nonbank banks ... and contemplated that some institutions would not be included [as banks under the Act]." In its decision setting aside the Board's new definition of commercial loan in Regulation Y, 12 C.F.R. part 225, § 225.2, the Tenth Circuit did not, however, rule specifically on whether nonbank banks could be established without regard to the Douglas Amendment. The Board is seeking a rehearing before the Tenth Circuit. We acknowledge that our present decision is in conflict with some of the language used by the Tenth Circuit in *Dimension*.

U.S. Trust Company does not come within the Board's broad definition of "bank," I would deny the proposal because it would have the practical effect of permitting a bank holding company to engage in interstate banking without express authorization of state law in a manner that would otherwise be prohibited by the Douglas Amendment.... Moreover, under section 4(c)(8) of the Act, the Board may deny a proposal if it determines that the adverse effects of the proposal are not outweighed by any public benefits associated with the proposal.

The dissent clearly believed that U.S. Trust urges a position that is plainly inconsistent with the purpose of the Douglas Amendment to prevent undue concentration of power and certain conflicts of interest. Even the majority, which felt constrained to approve the U.S. Trust application, was concerned that "if the nonbank concept ... becomes broadly generalized, a bank holding company ... through exploitation of an unintended loophole, could operate 'banks' ... defeating Congressional policies on interstate banking."[16] Accordingly, we cannot accept U.S. Trust's argument that the fact that the Board approved its application, however reluctantly, ends any further inquiry on our part. Our duty is to review the decision of the Board and ascertain whether it has correctly followed the congressional policies expressed in the Act. We perceive the U.S. Trust application to be a violation of the Douglas Amendment; such a violation cannot be justified by the Board's power under § 4(c)(8) to approve activities closely related to banking. Activities approved as closely related to banking have been the acquisition of brokerage services or the offering of credit life insurance, not the wholesale abandonment of

one of Congress' chief goals in enacting the Bank Holding Company Act.

Additionally, we believe U.S. Trust's argument that its nonbank will have an innovative and competitive effect on the market for financial resources in Florida to be erroneous. Since U.S. Trust cannot make commercial loans in Florida from the deposits it attracts, it is patent that Florida's policy of having local money available for local development will be hindered. While it is true that funds can be secured from out-of-state—indeed from U.S. Trust in New York—such a policy is directly contrary to the accepted notion that local funding of local projects is a significant and important incident of state control over banking. It suffices that Florida has spoken clearly that it does not want out-of-state bank holding companies to establish banking operations in Florida.[17] To approve the U.S. Trust application would destroy Florida's state policy to not allow the unfettered expansion of out-of-state bank holding companies. More importantly, such approval would also destroy the important federal policy embodied in the Douglas amendment—a federal policy which allows the state to choose for itself whether to open its borders to out-of-state banks.

### (c) *The Board's Power to Deny the U.S. Trust Application*

We hold that the Board should have used its power under § 5(b), 12 U.S.C. § 1844(b), to prevent evasion by U.S. Trust of the fundamental purposes of the Act. Section 5(b) expressly authorizes the Board "to issue such regulations and orders as may be necessary to enable it to administer and carry out the purposes of [the Act] and prevent evasions thereof." The rationale of the Third Circuit in *Wilshire Oil Co. v.*

**16.** *See* page 1138.

**17.** The Board's and U.S. Trust's reliance on *Lewis v. B.T. Investment Managers,* 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980), is misplaced. In that case the Court struck down a Florida statute which prohibited out-of-state bank holding companies from offering investment advisory services despite Board approval. Such services are incidents of banking requiring Board approval under the Act. This decision cannot be relied upon for the proposition that banks—deposit-taking institutions—can be established across state lines despite the Douglas Amendment.

*Board of Governors,* 668 F.2d 732 (3d Cir. 1981), *cert. denied,* 457 U.S. 1132, 102 S.Ct. 2958, 73 L.Ed.2d 1349 (1982), supports such a use of the Board's delegated authority under § 5(b). Wilshire Oil Company's bank subsidiary, which accepted demand deposits and made commercial loans, notified its demand deposit customers that in the future it would reserve the right to require 14 days notice before any withdrawal could be made from their accounts. The bank, however, also notified its customers that it had no intention of exercising this right. In other words, the bank in practice continued to accept demand deposits and make commercial loans even though the depositors technically had no legal right to immediately receive their money. Thus, the bank argued it no longer met the definition of a bank in § 2(c) because Congress in the 1970 amendments defined bank to require demand deposits and commercial loans. The Board had no trouble looking through the form of the bank's reorganization to its substance. The Board disregarded the technical nonconformity with the definition of bank and ruled that the subsidiary was still acting as a bank and was subject to the Act. While *Wilshire* is distinguishable in the sense that the bank was blatantly attempting to evade the Act, its rationale that the Board under § 5(b) had the power to disregard the form of a reorganization and look to its substance supports a similar use of the § 5(b) power by the Board in this case. The Board is Congress' custodian of the Act. In that capacity, it is charged with insuring compliance with Congress' goals even when Congress muddies the waters.

## VII. *Conclusion*

Since we have held that the Board should have used its authority under § 5(b) to deny the U.S. Trust application, we express no opinion on the constitutionality of the Florida statute or the parties' contention that an evidentiary hearing was required by the Board prior to its action.

REVERSED.

