NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES,
LOCAL R7–23, Petitioner,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent.

No. 84–1242.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 7, 1985.

Decided Sept. 3, 1985.

Gordon P. Ramsey, Boston, Mass., for petitioner.

Robert J. Englehart, Atty., Federal Labor Relations Authority, Washington, D.C., with whom Ruth E. Peters, Sol., Steven H. Svartz, Deputy Sol., and William E. Persina, Associate Sol., Federal Labor Relations Authority, Washington, D.C., were on the brief, for respondent.

Before EDWARDS, SCALIA and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

This petition arises out of unfair labor practice proceedings under the Federal Ser-

vice Labor-Management Relations statute, 5 U.S.C. §§ 7101–35 (1982). The National Association of Government Employees, Local R7–23 ("NAGE") seeks review of a Federal Labor Relations Authority decision involving the Department of the Air Force, Scott Air Force Base, Illinois. The Authority concluded that the agency did not interfere with statutorily guaranteed union rights in evaluating an employee's performance and in requesting the employee to devote more time to job-related work. The issue presented for review is whether this conclusion was arbitrary or capricious.

## I

Carl Denton has been a Computer Systems Analyst at Scott Air Force Base since 1973. In 1978, he was elected president of NAGE Local R7–23, the union representing all of the 3,000 civilian employees at the base. Since then, he has been an "active" and "visible" union advocate. Under the collective bargaining agreement in effect between the union and the base, Denton was entitled to a "reasonable" amount of official time to conduct union representational activities. These activities took up a substantial portion of his work week—between 47 percent and 92 percent during the period from May 1978 through January 1980. The remainder of his 40-hour work week was spent at his computer-analyst duties.

In May 1979, Denton was appointed to a new position—Quality Assurance Manager for the Consolidated Aerial Port Subsystems project ("CAPS"). In this position, he was expected to coordinate periodic audits of the CAPS program. In September 1979, in his capacity as union president, Denton began negotiations with the base to conclude a collective bargaining agreement. Negotiations were regularly scheduled for Mondays, Wednesdays, and Thursdays from 9 a.m. to noon and from 1 p.m. to 3 p.m. These continued through January 1980. During that last month, an important CAPS audit was scheduled, in which Denton, as audit manager, was expected to play an important role. On January 16,

Captain Dennis Hohman, Denton's first-line supervisor, requested Denton to delay or reschedule contract negotiations. Denton refused and said the discussion was making him very "nervous" and "sick." He thereafter took sick leave for the next two days and filed a claim of traumatic injury. (The claim was later dismissed because no causal relationship was found between any injury and the job.) When Denton returned to work on Monday, January 21, Hohman advised Denton that he was disappointed with Denton's participation in the audit. The audit, which did not go well, was completed on Friday, January 25.

On Monday, January 28, after completion of the contract negotiations for the day, Denton returned to his worksite. He then submitted to Hohman his projected work schedule for the remainder of the week, showing that 100 percent of his time would be spent on union business. As Hohman was reviewing the schedule, Lieutenant Colonel Anthony Serksnas, Denton's second-line supervisor, came by and looked at the schedule as well. Both Hohman and Serksnas then told Denton that they thought it was "unfair" for him to schedule all of his time for union activities. Denton replied that he thought it was fair, and that it was "kind of close to quitting time to be ganging up" on him. It was 4:30 p.m., and Denton then got up, put on his coat, and said it was time to leave. Serksnas replied, "Carl, I don't think I'm getting across to you. I think I've lost my sense of humor." Denton responded, "I only said 'good night,' sir" and kept walking towards the main corridor. Serksnas followed Denton and said, "Carl, if you don't start doing more work for me, I'm going to take disciplinary measures against you."

The next day, January 29, Denton filled out his daily report of time to be spent on representational duties and gave it to Hohman. Hohman told Denton that Serksnas wanted to meet with him. Denton was granted his request to have a union representative with him at the meeting. The meeting lasted four or five minutes, and Serksnas did all the talking. He told Den-

ton that he was not satisfied with the amount of time Denton had been spending on the audits. He asked Denton to postpone contract negotiations with the understanding that he would let Denton make up the time in the future when things quieted down. He said that he would take disciplinary action if Denton did not "start pulling his share."

Coincidentally, the end of January was also the time when Denton was scheduled to receive a performance evaluation from his supervisors. The evaluation rates employees on how much supervision they need to perform in twenty-one separate categories. Denton's 1980 appraisal by Serksnas and Hohman was lower than their appraisal for the previous year. Hohman said that it was difficult for him to be objective about the rating because of "outside happenings and outside things." But he also testified that his appraisal was based only on Denton's actual job performance and not on consideration of any of Denton's union activities.

The union filed three unfair labor practice charges with the appropriate Authority regional office, and the Authority's General Counsel issued a consolidated complaint on the charges. The complaint alleged that the base violated § 7116(a)(1), (2), and (4) by giving Denton a low performance appraisal because of his union activities. The complaint further alleged that the agency violated § 7116(a)(1) on January 28, 1980, when Hohman told Denton that he was spending too much time away from his CAPS work because of union responsibilities; and on January 28 and 29, 1980, when Serksnas threatened disciplinary action unless Denton started doing more CAPS work. A hearing was held before an administrative law judge, at which Denton, Hohman, and Serksnas testified.

On October 14, 1981, the ALJ issued his decision. With respect to the performance evaluation, he found that the rating was unrelated to Denton's union activities. With respect to the requests by Hohman and Serksnas that Denton devote more time to his job-related task, the ALJ concluded that "Mr. Denton's supervisors were threatening disciplinary action only based upon his work performance during the time he was actually on the job." The ALJ therefore recommended dismissal of the complaints. Two and a half years later, the Authority affirmed the ALJ and adopted his findings, conclusions, and recommendation to dismiss the complaints. The union filed a timely petition for review in this court pursuant to 5 U.S.C. § 7123(a).

## II

Under 5 U.S.C. § 7123(c), our review of FLRA orders is governed by the Administrative Procedure Act, 5 U.S.C. § 706 (1982). Accordingly, the Authority's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). (Although 5 U.S.C. § 7123(c) specifies that "[t]he findings of the Authority with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive," as we explained in *Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System*, 745 F.2d 677, 681–86 (D.C. Cir.1984), this is no more than a recitation of the application of the "arbitrary and capricious" standard to factual findings on a closed record.) Our role is to determine " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Motor Vehicle Manufacturers Association, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)).

 The portion of the complaint based on the performance evaluation alleged that the base violated § 7116(a)(1), (2), and (4), which provides in relevant part that "it shall be an unfair labor practice for an agency—(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under [the Statute];

(2) to encourage or discourage membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment; ... (4) to discipline or otherwise discriminate against an employee because the employee has filed a complaint, affidavit, or petition, or has given any information or testimony under [the Statute]. ..." The evaluation Denton received in January 1980 was asserted to violate these provisions because it downgraded his performance rating on the basis of his engagement in union activities. We believe that there was substantial evidence to support the ALJ's finding (adopted by the Authority) to the contrary.

The ALJ specifically found (inevitably, in our view) no indication in this record of anti-union animus. He further found that Denton's 1980 evaluation, while lower than that received in 1978 and 1979, was significantly higher than that received in 1976 and 1977. Thus, it was not remarkably at odds with past appraisals. The ALJ noted, moreover, that while Denton testified that nearly all computer specialists at his grade received all "A's" on their evaluations, Denton himself had received all "A's" only one of the seven times he was appraised, and that was on his very first appraisal in 1973. The ALJ chose to credit the testimony of Hohman, who frankly acknowledged that there had been difficult moments in his relationship with Denton, but maintained that nonetheless his evaluation was based solely on Denton's on-the-job performance. Since the ALJ's appraisal of this testimony is "neither 'hopelessly incredible' nor 'self-contradictory,'" we uphold it. See Conair Corp. v. NLRB, 721 F.2d 1355, 1368 (D.C.Cir.1983). Accordingly, we affirm the Authority's acceptance of the ALJ's findings and its dismissal of the complaint relating to the performance evaluation.

██ We turn next to the two alleged violations of 5 U.S.C. § 7116(a)(1) based upon complaints to Denton from his supervisors that he was spending too much time on union business, and accompanying threats of disciplinary action if that continued. After reviewing the circumstances of these incidents, the ALJ made the following crucial finding: "Taking all of the evidence into consideration, I conclude that Mr. Denton's supervisors were threatening disciplinary action only based upon his work performance during the time he was actually on the job." We cannot comprehend how the ALJ arrived at this conclusion. It follows on the heels of his finding that Hohman and Serksnas were trying "to persuade Mr. Denton to moderate his demands [for union time]." Also, the ALJ found that "on January 28 and 29, by requesting that he spend more time on his regular job, they were requesting that he spend less than 100 percent on Union matters, [and] it is clear on this record that they were merely insisting that he adhere to the terms of the contract and that they believed that 100 percent of his time was not 'a reasonable amount of official time.'" These preliminary findings simply do not support, and indeed positively contradict, the conclusion that Hohman and Serksnas "were threatening disciplinary action only based upon [Denton's] work performance." On the basis of the ALJ's own findings, the conclusion seems "incredible" and cannot support the Authority's affirmance of the ALJ on this point. See Conair, 721 F.2d at 1368.

It is not clear, however, that there are no other valid bases on which the ALJ's judgment could have been sustained. While the base could not lawfully threaten disciplinary action against an employee for spending authorized time—even if an unreasonable amount of time had been authorized—on union activities, it assuredly could refuse to authorize an unreasonable amount of time. In the context of the present case, the complaints about excessive time spent by Denton on union duties in the past and the accompanying threats of disciplinary action if that continued might conceivably be interpreted as the equivalent of notice that future requests for authorization of unreasonable time would be denied, and that the expenditure of unauthorized time would be punished. We deem it inappropri-

ate, therefore, to conclude at this stage that the agency was wrong in finding no violation of the Act; but hold only that it was assuredly not right for the reasons stated. Accordingly, we remand the portion of this case pertaining to violation of § 7116(a)(1) to the Authority, for further consideration and action not inconsistent with this opinion. Because of the inordinate delay in the Authority's handling of this proceeding in the past, we will provide the appellant further relief if a final decision by the Authority is not forthcoming within ninety days.

*So ordered.*